IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAN JUAN COAL COMPANY,

       Plaintiff,

vs.                                                      No. 10-CV-00099 MV/LFG

INTERNATIONAL UNION OF
OPERATING ENGINEERS, LOCAL 953,

       Defendant.

**MEMORANDUM OPINION AND ORDER GRANTING
PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiff's Motion for Summary Judgment (Doc. 24) and Defendant's Motion for Summary Judgment and Memorandum in Support (Doc. 23). The Court has considered the parties' motions, responses, briefs, exhibits and attachments, and the relevant legal authority. Being otherwise fully advised of the premises therein, the Court finds there are no genuine issues of material fact and Plaintiff, San Juan Coal Company, is entitled to judgment in its favor as a matter of law pursuant to Federal Rule of Civil Procedure 56.

**I. FACTUAL BACKGROUND**

This case concerns a dispute between Plaintiff, San Juan Coal Company ("Company"), and Defendant, the International Union of Operating Engineers, Local 953 ("Union") over the interpretation of the terms of a Memorandum of Agreement ("MOA") entered into by the parties on March 6, 2009.[1] The Union represents employees of the Company and is their sole and exclusive bargaining agent. The MOA was the result of negotiations between the Company and

---

[1] Compl. Ex. B. All further references to the MOA refer to this document.

the Union.  The Company sought to reduce production costs by reorganizing employee schedules.  The Company and Union entered into negotiations to create a new work schedule to meet the needs of the Company and the employees.  During negotiations, the Union proposed creating a weekend shift.  The proposal was accepted by the Company and ultimately adopted by the parties as set forth in the MOA.  The MOA modifies, in part, the parties' previously adopted Collective Bargaining Agreement ("CBA"), effective May 1, 2006.[2]  To the extent the MOA does not alter the CBA, the CBA remains effective and controls the terms and conditions of employment for the employees subject to the MOA.

The portion of the MOA at issue concerns the "weekend shift" created by the parties, in which employees working the weekend shift are required to work three (3) consecutive "10 + 2" hour days, ten hours of which are paid at the employee's normal rate of pay and two hours of which are paid at the overtime ("OT") rate of one and one-half (1 ½) times the employee's normal rate of pay.  This structure results in weekend shift employees receiving 39 hours of pay for 36 hours of work.[3]  The parties do not dispute this arrangement and agree the intent of this pay structure was to provide 39 hours of pay to employees working the weekend shift.

Approximately one month after the new weekend schedule was implemented, a grievance was filed by the Union claiming the Company failed to abide by Article VI of the CBA, which provides, "If an employee is required to work for two (2) hours after completion of their *shift*, they will be paid an additional one half hour at one and one-half times (1 ½) the normal rate of pay." (Emphasis added.)  The Union contends employees working the weekend shift are entitled

---

[2]  Compl. Ex. A.  All further references to the CBA refer to this document.

[3] The calculation for this pay arrangement is as follows: (10 hours x 3 days) + ((2 hours x 3 days) x 1.5) = 39 hours.

to this one-half (½) hour holdover pay for each of the three days worked.  It contends the weekend shift is 10 hours, and the two hours of mandatory overtime triggers the holdover pay provision.  The Company disagrees arguing the employees are not entitled to holdover pay because they were not being held beyond their shift.  The Company contends the weekend shift is a total of 12 hours; therefore, employees working 12 hours are not entitled to holdover pay.

On October 7, 2009, an arbitration hearing was conducted by Arbitrator Francis Quinn pursuant to Article VIII(b) of the CBA.  On December 8, 2009, the arbitrator issued an award in favor of the Union, finding the Company had violated the CBA and ordering the Company to "make whole all employees harmed by this violation of the CBA."[4]  On February 5, 2010, the Company filed a Complaint to Set Aside Arbitration Award. (Doc. 1.)  Thereafter, the parties filed cross motions for summary judgment.  (Docs. 23 & 24.)

## II. JURISDICTION

This Court has jurisdiction to review the decision of an arbitrator in an employer-labor organization dispute pursuant to § 301 of the Labor Management Relations Act of 1947, as amended by 29 U.S.C. § 185(a).  The parties agree venue is proper in the District of New Mexico because the Union resides in this district.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Summary judgment is clearly an appropriate mode for the resolution of an action to enforce an arbitrator's award.  The ordinary analysis of motions under Fed. R. Civ. P.

---

[4] Compl. Ex. C ("Award").  All further references to the Award refer to this document.

56 is not particularly helpful, because the enforcement proceeding is by nature summary. Disputes of fact should have been resolved by the arbitrator, and may not be addressed by the district court, even if the court is convinced that the arbitrator committed serious error." *Airline Pilots Ass'n Int'l v. Aviation Ass'n, Inc.*, 955 F.2d 90, 93 (1st Cir. 1992) (citing *United Paperworkers Int'l v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987)).

The Tenth Circuit describes a district court's review of an arbitration award as "among the narrowest known to the law." *Champion Boxed Beef Co. v. UFCW, Local No. 7*, 24 F.3d 86, 87 (10th Cir. 1994) (quoting *Litvak Packing Co. v. UFCW, Local No. 7*, 886 F.2d 275, 276 (10th Cir. 1989)). "The arbitrator's factual findings are beyond review, and, so long as the arbitrator does not ignore the plain language of the collective bargaining agreement, so is his interpretation of the contract." *Champion Boxed Beef Co.*, 24 F.3d at 87 (citing *Misco, Inc.*, 484 U.S. at 37-38) (citation omitted)). "As long as the arbitrator's award 'draws its essence from the collective bargaining agreement' it must be upheld." *Champion Boxed Beef Co.*, 24 F.3d at 87 (quoting *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960)). "This standard is not an invitation to a court to substitute its judgment for that of an arbitrator. The parties have contracted for an arbitrator to resolve their disputes, not a court. They have agreed to be bound by the arbitrator's factfinding and contract interpretation whether his findings and conclusions are correct or not." *Litvak Packing Co.*, 886 F.2d at 276 (internal citations omitted). Thus, the Tenth Circuit made clear "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision." *Id.* (quoting *Misco*, 489 U.S. at 38).

However, "an arbitrator's discretion, though entitled to 'profound deference,' is not unlimited." *LB&B Assocs., Inc. v. International Bhd. of Elec. Workers, Local No. 113*, 461 F.3d 1195, 1197 (10th Cir. 2006) (internal quotation omitted).  An arbitrator is not free to "dispense his own brand of industrial justice." *Enter. Wheel & Car Corp.*, 363 U.S. at 597.  An award does not draw its essence from the contract if it is "contrary to the express language of the contract" or "is so unfounded in reason and fact, so unconnected with the working and purpose of the agreement as to manifest an infidelity to the obligation of the arbitrator or if viewed in the light of its language, its context, and any other indicia of the parties' intention, it is without factual support." *Mistletoe Express Service v. Motor Expressmen's Union*, 566 F.2d 692, 694 (10th Cir. 1977) (citations omitted).  Therefore, where it is "clear that the arbitrator 'must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract (and not incorporated in it by reference),' the arbitral award cannot stand." *Harry Hoffman Printing, Inc. v. Graphic Commc'ns Int'l Union, Local 261*, 950 F.2d 95, 98 (2d Cir. 1991) (quotations omitted).

## IV.  ANALYSIS

The Court is mindful of the narrowness of its review of the arbitrator's award and is careful to ensure that it is not substituting its own judgment for that of the arbitrator.  The Court accepts the factual findings of the arbitrator and does not question his interpretation of the MOA or the parties' intentions.  The Court limits its assessment of the arbitrator's award to determining whether the arbitrator "went beyond, or outside, the bounds of interpreting the contract before him while fashioning his award." *Anheuser-Busch, Inc. v. Local Union 744, IBT*, 280 F.3d 1133, 1137 (7th Cir. 2002).  "The question is not whether the arbitrator misinterpreted the agreement, but only whether the arbitrator's inquiry disregarded the very language of the

5

agreement itself." *Id.* at 1137-38 (citations omitted).

In an effort to interpret the MOA and CBA, the arbitrator sought to define ambiguous and undefined terms therein. He determined that "full time" as used in the MOA means 40 hours of work per week based upon the parties' use of the term and the general "world of work." Award at 3. "Full time" is not defined in the MOA or CBA. The arbitrator also equated "shift" with "normal workday" on the basis that a "normal workday" is "the term the parties chose to measure benefits contained in the CBA." *Id.* These terms are not identified in the CBA or MOA as synonymous, and therefore this determination was also based upon extraneous evidence. The arbitrator sought to define these terms in an effort to determine whether the parties intended for the weekend shift to be 10 or 12 hours. It is clear that an arbitrator "may consider and rely upon extrinsic evidence, including negotiating and contractual history of the parties, evidence of past practices, and the common law of the shop, when interpreting ambiguous provisions." *Champion Boxed Beef Co.*, 24 F.3d at 88-89. Therefore, the arbitrator's effort to define these terms was not entirely unreasonable.

The problem with the arbitrator's analysis is that by focusing on the undefined terms and extraneous evidence regarding the parties' intentions, the arbitrator lost sight of the plain language of the MOA and CBA. Although an arbitrator may resolve ambiguities in a contract by considering extrinsic evidence, he cannot use such evidence "to alter or rewrite an unambiguous provision" in the contract. *CP Kelco US, Inc. v. Int'l Union of Operating Eng'rs*, 381 Fed.Appx. 808, 814 (10th Cir. 2010) (unpublished) (citing *Champion Boxed Beef Co.*, 24 F.3d at 88-89); *see Tootsie Roll Industries, Inc. v. Local Union No. 1, Bakery, Confectionery & Tobacco Workers' Int'l Union*, 832 F.2d 81, 84 (7th Cir. 1987) ("law of the shop cannot be relied upon to modify clear and unambiguous provisions"). "[A]n award that ignores the plain and unambiguous

language of the arbitration contract does not 'draw its essence' from the agreement, and may therefore be overturned. . . ." *Norfolk & W. Ry. v. Transp. Communications Int'l Union*, 17 F.3d 696, 700 (4th Cir. 1994) (citations omitted); *see also Mistletoe Express Service*, 566 F.2d at 695 (An arbitration award will not be upheld when it contravenes the express language of the labor contract.).

Here, at the outset, the MOA expressly sets forth a "new work schedule" with three different shift options for its employees: "5/8 Hour Shifts; 4/10 Hour Shifts & 3/10 + 2 OT Hours Weekend Shifts." Each of these schedules describes the periods of work as "shifts." "Shift" is the operative and critical word because it triggers the application of holdover pay.[5] Not only is the entire 12-hour period in question clearly identified as a "shift," but a common sense interpretation of this sentence, embodied in the principle of *noscitur a sociis,* "teaches that a term which is part of a series should be interpreted like the other words in that series." *See Exec. Sounding Board Assocs. v. Wham-O, Inc. (In re Yes! Entertainment Corp.)*, 336 B.R. 203, 210 (Bankr. D. Del. 2006) (citing 5 *Corbin on Contracts* § 24, 28; *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961)). It is undisputed that the first two work schedules in this series ("5/8 Hour Shifts" and "4/10 Hour Shifts") identify the total hours in the workday as "shifts"; therefore, the third work schedule in this series should be similarly interpreted as identifying the total hours in the weekend workday as a "shift."

Additionally, applying the usual and ordinary meaning to the term "weekend shift" would lead the average person to believe the entire period identified as the "weekend shift" is the

---

[5] Specifically, Article VI(c) of the CBA states: "If an employee is required to work for two (2) hours after the completion of their *shift*, they will be paid an additional one half hour at one and one-half times (1 ½) the normal rate of pay." (Emphasis added.)

actual length of the shift. *See Gresham v. Lumbermen's Mut. Cas. Co.*, 404 F.3d 253, 260 (4th Cir. 2005) (contract terms construed with their usual and ordinary meaning); *Resolution Trust Corp. v. Ocotillo W. Joint Venture*, 840 F.Supp. 1463, 1482 (D.N.M. 1993) (identifying basic principles of contract interpretation including applying the usual and ordinary meaning to its terms (citations omitted)). It makes little sense to call a work schedule the "weekend shift," and then interpret it as something other than a shift. This basic premise appears to have been ignored by the arbitrator.[6]

Next, the MOA heading for the period in question is unambiguously identified in bold, capital letters as "WEEKEND SHIFTS." Included within this section, is the provision stating, "[t]he weekend shift *will include* an additional two (2) hours of mandatory overtime, which has been mutually agreed upon." (Emphasis added.) This provision is unambiguous and plainly states that the overtime hours are *included* in the weekend shift, not separate and apart from it as determined by the arbitrator. There is nothing in the CBA or MOA that limits the length of a shift to ten hours or states that a shift cannot include mandatory overtime hours. The parties were free to negotiate whatever length of shift they wanted for the weekend, which in this case *included* two hours of mandatory overtime.[7] Therefore, by finding the weekend shift is only 10 hours, the arbitrator failed to give effect to this express contract provision and altered the terms of the MOA.

---

[6] The "weekend shift" is clearly the term used in the MOA to identify the work schedule at issue. The arbitrator adopted its usage in his award, yet appears to turn a blind eye to the presence of the word "shift" in this context.

[7] Finding the weekend shift consists of 12 total hours is also more consistent with the interpretation of the other available work schedules. According to the MOA, employees working 10-hour shifts, work four days a week, not three days. Therefore, it follows that employees working shorter days (8 hours) work more days (5 days); while employees working longer days (12 hours), work fewer days (3 days).

In the award, the arbitrator claims "the MOA explicitly identifies the Weekend Shift as a ten (10) hour shift." (Award, p. 3.) This assertion misstates the language of the MOA. On the contrary, the MOA clearly and repeatedly identifies the entire twelve hour period at issue as a "weekend shift." As discussed, the MOA describes the weekend shift as "3/10 + 2 OT Hours Weekend Shifts" and as "includ[ing] an additional two (2) hours of mandatory overtime." The only reference in the MOA to a "10 Hour Shift" is in the section concerning Leave Bank[8]. This section says: "Leave Bank for a Weekend Shift (10 Hour Shift + 2 Hours OT) will be accounted for by 10 Hours Leave Bank Utilized."[9] This sole reference to a "10 Hour Shift" is somewhat inconsistent with the remainder of the language in the MOA. A review of this provision shows that the words in parenthesis are intended to modify the term "Weekend Shift." Thus the primary term, "weekend shift," remains the operative language. Moreover, as a descriptor, the modifying language nonetheless identifies a total twelve hour period as the weekend shift. Therefore, in this sense, this provision can be read as consistent with the other provisions in the MOA concerning the weekend shift.

This Court must review the MOA as a whole to give effect to every provision where reasonably possible. *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 100 L.Ed. 309 (1956) (collective bargaining agreement, like other contracts, must be read as a whole to determine its meaning); *Steele Founds., Inc. v. Clark Constr. Grp., Inc.*, 937 A.2d 148, 154 (D.C. 2007) (contractual provisions "must be interpreted as a whole" "so as to give effect, if

---

[8] Leave Bank generally concerns the amount of leave accrued and used by an employee. According to the MOA, 10 hours of leave are used for a weekend shift.

[9] The arbitrator does not make any reference to the leave bank provision in the MOA; and therefore, does not appear to rely upon it in his assessment of the contract.

9

possible, to all of the provisions in the contract"). The Court must not only attempt to construe the leave bank provision consistently with the other provisions in the MOA, but it must avoid taking this provision out of context and nullifying other express contract terms. Here, it would be imprudent for the Court to place greater weight on the use of a modifier in a provision concerning "leave bank" than the explicit provision stating the weekend shift "will *include* an additional two (2) hours of mandatory overtime." (Emphasis added.) For these reasons, the Court finds the sole reference to a "10 Hour Shift" does not have the effect of altering the remainder of the MOA which clearly identifies the full 12 hour period as a shift– the weekend shift.

The arbitrator's decision also relies heavily on the inclusion of the provision in the MOA identifying the "normal workday" as "no more than ten (10) consecutive hours of work." This provision restates the language used in Article VI(b)(1) of the CBA. The arbitrator finds that because "normal workday" is the term used by the parties to "measure the benefit of paid holidays[10]. . . [f]or purposes of consistency in applying the MOA, the Weekend Shift must be treated in the same fashion that the Company treats it for the application of other benefits." Award at 3-4.

This assessment relies upon extraneous evidence and the arbitrator's own interpretation of the MOA, which is contrary to the plain language of the contract. Nowhere in the CBA or MOA is a "normal workday" identified as a "shift." A review of the plain language in the CBA and MOA clearly indicates these terms are used for different purposes. According to Article

---

[10] Specifically, the arbitrator found that a "'[n]ormal workday' is the gauge the parties used to measure the benefit of paid holidays." (Award at 3.) This finding is based upon witness testimony given at the arbitration hearing and is not a provision in the MOA. The Court accepts this factual finding as true, as it must. *See Misco*, 484 U.S. at 38.

VI(a) of the CBA, the provision concerning the "normal work day" is "established for *payroll calculation purposes only* and *shall not be construed as a representation* or guarantee by the Company *of any time or period of work* or employment." (Emphasis added.)  Thus, the CBA clearly ties the term "normal work day" to the manner in which an employee's pay is calculated and expressly states it is *not* a representation of "any time or period of work."  Consequently, the arbitrator's determination that because a "normal workday" is the measure of holiday pay (a payroll calculation) it must also be used as a measure of the weekend shift (a period of work), is directly contrary to the express language of the CBA.  Moreover, "normal workday" is not used in any other context in the CBA or MOA, eliminating the possibility of ambiguous interpretation that would allow the arbitrator to decide the ambiguity.[11]   Consequently, the arbitrator exceeded his authority by stretching the meaning of "normal workday" to define a period of work– the weekend shift.

Finally, concerning overtime, the parties agree that the MOA provides employees working the weekend shift with 39 hours of pay for 36 hours of work based upon the inclusion of the mandatory overtime language.  It is undisputed that the purpose of the overtime ("OT") provision was to provide additional income to employees working the weekend shift.  In this regard, the term "overtime" is used as a function of payment.  Without describing two hours of the weekend shift as "overtime," these hours would have been treated as regular, straight time hours under the CBA, resulting in only 36 hours of pay, rather than the intended 39 hours of pay.

---

[11] If the term "normal workday" was ambiguous, the arbitrator would have authority to interpret the term in accordance with his assessment of the contract.  The Court would have no basis for overturning the arbitrator's decision in this regard, even if it disagreed with his interpretation.  *See Champion Boxed Beef Co.*, 24 F.3d at 88-89.  However, when a term is clearly and unambiguously limited in its intended use pursuant to express contract language, as in this case, the arbitrator's extension of the term to serve other purposes is prohibited and can be overturned by the Court.  *See Mistletoe Express Service*, 566 F.2d at 695.

Article VI(c) of the CBA does not provide overtime until employees: 1) work "in excess of forty (40) hours;" 2) work "beyond the scheduled hours for a particular day;" or 3) "work for two (2) hours after the completion of their shift." Under each of these circumstances, if the weekend shift had merely been identified as a "12-hour shift," as the arbitrator suggested[12], the employees working the weekend shift would not automatically receive overtime pay. Consequently, describing the weekend shift as "10 + 2 OT hours" rather than "12 hours" reflects the parties' intent to provide employees working the weekend shift with 39 hours of pay.

Furthermore, the overtime provisions set forth Article VI(c) of the CBA remain operative and do not conflict with the MOA.[13] Weekend shift employees, like all other employees, qualify for overtime pay under the circumstances described in Article VI(c).[14] With respect to the applicability of holdover pay specifically, like all other employees, weekend shift employees are entitled to receive "an additional one half hour at one and one-half times (1 ½) the normal rate of pay" when they "are required to work for two (2) hours after the completion of their shift." Because a weekend shift is a total of 12 hours, the holdover pay provision becomes operative after weekend shift employees complete their 12 hour shift.

---

[12] The arbitrator asserts, "[t]he parties carefully negotiated a Memorandum of Agreement which avoided reference to the Weekend Shift as a twelve (12) hour shift." (Award at 4.) This statement is true. Reference to the weekend shift as a "12 hour shift," without delineating 2 hours of the shift as overtime hours, would have the effect of treating all 12 hours as straight time hours, resulting in a total of 36 hours pay. Thus, the manner in which the parties described the weekend shift, "10 + 2 OT Hours," is in keeping with their agreement to provide employees working the weekend shift with 39 hours pay.

[13] The MOA expressly states: "No other terms and conditions of the CBA are affected by this MOA."

[14] The MOA confers a benefit to weekend shift employees of additional overtime pay that is not available to employees working other shifts. The benefit of the MOA (39 hours pay for 36 hours work) is in addition to the overtime pay provisions in Article VI(c), not in lieu of those provisions.

## V. CONCLUSION

For the foregoing reasons, the Court finds the arbitrator exceeded his authority. The arbitrator's decision is contrary to the plain language of the MOA and CBA, and therefore does not "draw its essence" from these documents. Consequently, the Court hereby **VACATES** the arbitrator's award; **GRANTS** Plaintiff's Motion for Summary Judgment (Doc. 24); and **DENIES** Defendant's Motion for Summary Judgment (Doc. 23). Each party shall bear its own costs and attorneys' fees.

Dated: March 31, 2011.

_____
MARTHA VAZQUEZ
UNITED STATES DISTRICT JUDGE